* * * * * * * * * * *
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence, affirms the holding, but significantly modifies the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. The parties are bound by and subject to the North Carolina Workers' Compensation Act.
2. Plaintiff was an employee of Warlick Grading.
3. The Carrier for the Defendant-Employer is Penn National Insurance Company.
4. The parties admit that Plaintiff sustained a compensable right eye injury on December 13, 2000.
5. Plaintiff's compensation rate is $233.35.
6. Defendant-Employer has paid all claimed temporary total disability benefits to date, and there is no issue in dispute between the parties concerning unpaid indemnity benefits.
7. The parties stipulated into evidence as Stipulated Exhibit # 1, the Pre-Trial Agreement, as modified and initialed by the parties.
8. The parties stipulated into evidence as Stipulated Exhibit # 2, the medical records.
 * * * * * * * * * * *
Based on the foregoing Stipulations and the evidence presented, the Full Commission makes the following:
 FINDINGS OF FACT
1. The issues on appeal are: (a) whether Plaintiff's bipolar disorder is directly related to his compensable eye injury of December 13, 2000; and (b) whether Defendants are obligated to pay for medical treatment for Plaintiff's bipolar disorder.
2. The parties have stipulated that Defendants have paid all claimed temporary total disability benefits through the date of the hearing before the Deputy Commissioner.
3. At the time of the hearing before the Deputy Commissioner, Plaintiff was 23 years old, having a date of birth of April 21, 1981. He completed high school and subsequently enrolled in a two-year program for civil engineering at Central Piedmont Community College. Plaintiff started working for Defendant-Employer after graduating high school and had worked for Defendant-Employer for 1½ years prior to his December 13, 2000 injury at work. Defendant-Employer hired Plaintiff to drive a dump truck, do some odd jobs and sometimes perform grading work.
4. On December 13, 2000, Plaintiff was hammering a piece of metal when a metal fragment flew off and went into his right eye. The impact of the metal going into his right eye was so strong that it knocked Plaintiff to the ground. Plaintiff was in the hospital for the eye injury for three days. As a part of the treatment of his eye injury, Plaintiff underwent a corneal transplant and a lens transplant on July 10, 2001. As a result of his injury, Plaintiff is legally blind in his right eye.
5. Prior to December 13, 2000, Plaintiff had not been diagnosed as suffering from bipolar disorder. After the work-related incident, Plaintiff frequently became upset, frustrated, sad and angry. Several weeks after the eye injury, Plaintiff began acting strange, including: (a) walking down a country road at approximately 2:00 a.m. with a fishing pole and telling the police that he was looking for a Bible; (b) attempting to write a $35,000.00 check for a new vehicle and telling the bank teller that his father owned the bank and that it was okay for her to give him the $35,000.00; (c) believing that all policemen are gay, (d) believing that the television talks to him; (e) attaching sticky notes all over his room in order to remind him to do things that he would normally remember to do prior to the injury; (f) thinking his cell phones were tapped; (g) striking a police officer who stopped him from walking down the middle of a country road; (h) not sleeping at night; (i) walking in circles in the yard; (j) telling nurses at Presbyterian Hospital he was the new doctor on the floor; and (k) telling other patients, while in group therapy, that he was a professional baseball player. Plaintiff never engaged in these types of unusual behaviors prior to his eye injury.
6. Defendants submitted into evidence various medical records to establish Plaintiff might have used Ecstasy prior to the onset of his bipolar disorder. Plaintiff testified that he had never used illegal substances, except marijuana, and any statements he might have made to the contrary were false and the result of his mental condition. The Full Commission finds Plaintiff's testimony on this issue to be credible.
7. Plaintiff was admitted to Presbyterian Hospital for his unusual behaviors on July 2, 2001. Dr. Jean Allen Melvin, who is a board certified psychiatrist with certifications in general psychiatry, geriatric psychiatry, and addiction psychiatry, treated Plaintiff. Dr. Melvin has treated hundreds of bipolar disorder cases and is comfortable in diagnosing this disorder. Dr. Melvin explained that Plaintiff's bizarre behavior over the several months that led to his admission to Presbyterian Hospital was consistent with bipolar disorder. After the initial hospital visit, Dr. Melvin saw Plaintiff in his office and found he was hypomanic, which by definition is bipolar disorder.
8. Dr. Melvin treated Plaintiff from July 2001 through September 2004, and continues to be his treating physician. Dr. Melvin testified that the type of behavior Plaintiff exhibited, is consistent with the manic phase of bipolar disorder and that once you have one episode of bipolar disorder, you are always bipolar; once you have one episode of mania, you are always bipolar; and you are going to be at a high risk to have another episode. Dr. Melvin opined that bipolar disorder is a lifelong condition.
9. Dr. Melvin is of the opinion that the stressors in Plaintiff's life could contribute to his symptoms, but the bipolar disorder itself is what causes him to be depressed. Dr. Melvin ultimately opined that he did not think the injury itself caused Plaintiff's bipolar disorder, but the stress related to the injury could have brought forth the bipolar disorder and pushed him into a mood swing.
10. Dr. Melvin was of the opinion that Plaintiff needs to stay on the prescribed Lithium, have laboratory tests performed regularly and have regular office visits every three months as long as he is stable, and if he becomes unstable, more frequent office visits would be required.
11. When questioned on whether use of the illegal substance, Ecstasy, would cause people to exhibit grandiose behaviors, Dr. Melvin stated that he did not know.
12. Plaintiff saw Dr. Brian Monteleone, a clinical psychologist, while admitted to Presbyterian Hospital from July 1, 2001 to July 6, 2001. Dr. Monteleone testified that Plaintiff's personality inventories revealed that he was energetic and enthusiastic, with a passive, aggressive orientation. Dr. Monteleone was of the opinion that the personality inventories confirmed a diagnosis of bipolar disorder and that the distinct behavioral changes that took place in Plaintiff after the accident were consistent with manic episodes, which are significant symptoms of bipolar disorder. He opined that Plaintiff's use of marijuana would not have affected his diagnosis of bipolar disorder.
13. Dr. Monteleone testified that in his professional opinion, the injury to Plaintiff's eye might have had something to do with the bipolar disorder being brought out, but intervening factors would also be involved. He opined that bipolar disorder is considered hereditary, and based on the history given, Plaintiff's father might have suffered from bipolar disorder. In his written report, Dr. Monteleone indicated that Plaintiff's occupational injury would not be considered a stimulus in the onset of bipolar disorder. He agreed that the bipolar disorder had not surfaced prior to the injury and opined that the "accident at work was a significant intervening factor in the onset of the bipolar disorder."
14. Dr. Frank Highley, a psychiatrist, saw Plaintiff on January 17, 2002, and diagnosed him with "major depression, single episode with psychotic features, and a possible brief psychosis" that was in remission. Dr. Highley opined that Plaintiff's symptoms were causally related to his eye injury. Dr. Highley testified that he did not remember talking about other stressors in Plaintiff's life other than the eye injury and about various parts of Plaintiff's childhood, but did not feel his childhood was a stressor in Plaintiff's life, or something that would have caused the onset of bipolar disorder. Dr. Highley also testified that any use of an illegal substance by Plaintiff could have had an impact on his bipolar disorder.
15. On July 29, 2003, Dr. Vincent Lombardi, a psychiatrist, saw Plaintiff for further evaluation of his symptoms. Dr. Lombardi indicated in his notes that Plaintiff had been going along fairly well with limited distractions until he had his eye injury. Dr. Lombardi noted that thereafter Plaintiff was not himself and his behavior had become much more pronounced and severe leading up to the cornea transplant surgery. Dr. Lombardi was fairly confident there was a connection between the injury and the manic episodes that followed. He testified that the accident and subsequent cornea transplant surgery likely precipitated the episodes that led to Plaintiff's July 1, 2001 admission to Presbyterian Hospital for exhibiting bizarre behavior.
16. Dr. Lombardi opined that while the injury was not the cause, it was a significant contributor to Plaintiff's onset of his bipolar disorder. He opined that the loss of an eye was the kind of trauma that could lead to the development of psychiatric symptomatology, such as bipolar disorder. The Full Commission gives greater weight to his opinion on this issue. He also opined that without the eye injury, it is possible the bipolar disorder would never have surfaced.
17. Dr. Lombardi also testified that there is a strong overlap between bipolar disorder and substance abuse, and if Plaintiff had been using illegal substances, his bipolar disorder could have been hastened.
18. Plaintiff saw Dr. Peter Ewert, a neuropsychologist, for a neuropsychological consultation on November 11, 2003. Dr. Ewert's assessment of Plaintiff was that he had Bipolar Disorder I, meaning he had experienced a manic episode and a depressive episode, with the most recent one being manic. Dr. Ewert was of the opinion that the stress involved in Plaintiff's accident and the fact that he had received a corneal transplant were the traumatic incidents that triggered his bipolar disorder. Dr. Ewert reasoned that, from his review of the records, there was no other evidence that the bipolar disorder had been expressed prior to the eye injury. It was his opinion that the stressor of the accident was sufficiently severe to trigger the bipolar disorder.
19. When asked about Plaintiff's alleged drug use, Dr. Ewert stated that it was unlikely that the manic episodes Plaintiff had were side effects of drug use. Plaintiff was advised to avoid use of an illegal substance in order to control his bipolar disorder. Dr. Ewert opined that Plaintiff would need future medical treatment in the form of seeing a psychiatrist and a psychologist for help dealing with his the symptoms of his bipolar disorder.
20. Dr. Ewert recommended psychotherapy twice a week for three months and then re-evaluation visits to a neurologist for headaches and a vision specialist to see if there is any kind of vision therapy that would help, including a visit with Dr. Haleo. Dr. Ewert was of the opinion that Dr. Haleo could work with Plaintiff's vision and this would indirectly help Plaintiff's bipolar disorder. Dr. Ewert also recommended that Plaintiff receive treatment with Dr. McDonald for headaches associated with the bipolar disorder.
21. Based on the greater weight of the evidence, the Full Commission finds that the stress on Plaintiff caused by his compensable eye injury either triggered Plaintiff's bipolar disorder, or was a significant contributor to the onset of Plaintiff's bipolar disorder and that Plaintiff will need medication, psychological counseling and regular medical visits in the future for his bipolar disorder. The Full Commission gives great weight to the opinion of Dr. Ewert, a neuropsychologist, and finds that use of an illegal substance did not cause or contribute to the onset of Plaintiff's bipolar disorder.
22. Plaintiff testified that as a result of his eye injury, he has been required to wear safety glasses to reduce the amount of dust accumulating in his right eye. He also is no longer allowed to do roofing or ladder work, walk on uneven ground, or engage in horseplay. Plaintiff attempted to return to work with Defendant-Employer in March 2001, but was unable to perform his job duties. He next worked at McCollum Trucking Grading from April 2002 to April 2003, driving a Bobcat and putting gravel in driveways. After that, Plaintiff worked with McGee Brothers, Inc. from April 2003 to April 2004, operating equipment such as loaders or bulldozers. Plaintiff next took a job at FR Engineering because at that time he desired to go back to school for civil engineering. He testified he did not have the depth perception required to do grading work, and wanted to pursue a different career path. Plaintiff worked for FR Engineering from April 2004, until approximately May 2004, when he quit because he was not getting enough hours.
23. Plaintiff testified that he did not have any issues associated with his bipolar condition that caused him to miss work, except when he had doctors' appointments.
24. Plaintiff's temporary total disability from his December 13, 2000 eye injury ended when he returned to work in March 2001. Based on Plaintiff's testimony that he did not miss any work due to his bipolar disorder, other than missing time at work for doctors' appointments, Plaintiff did not suffer any temporary total disability as a result of his bipolar disorder.
25. Plaintiff's need for medical treatment related to his bipolar disorder is causally related to, or is the direct and natural consequence of his compensable eye injury of December 13, 2000.
26. The treatment provided to Plaintiff for his eye injury and for his resulting bipolar disorder was reasonably required to effect a cure, provide relief or lessen his disability resulting from his December 13, 2000 injury by accident. Defendants have paid for all of the treatment for Plaintiff's bipolar disorder through the date of hearing before the Deputy Commissioner.
27. Defendant-Insurer appealed this case to the Full Commission. The Deputy Commissioner awarded compensation for medical treatment for bipolar disorder to Plaintiff and the Full Commission hereby affirms that decision. The Full Commission finds that the costs of this appeal, including a reasonable attorney's fee, should be taxed to Defendant-Insurer pursuant to N.C. Gen. Stat. § 97-88.
 * * * * * * * * * * *
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission concludes the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an admittedly compensable injury by accident to his right eye arising out of and in the course of his employment with Defendant-Employer on December 13, 2000. N.C. Gen. Stat. § 97-2(6).
2. When the primary injury is shown to have arisen out of an injury by accident, every natural consequence that flows from the injury likewise arises out of the employment, unless it is the result of an independent intervening cause. Thus, a subsequent injury is compensable if it is the direct and natural result of the compensable primary injury. Starr v. Charlotte Paper Co.,8 N.C. App. 604 (1970). Plaintiff's bipolar disorder and need for medical treatment related to his bipolar disorder are causally related to, and the direct and natural consequence of his compensable eye injury of December 13, 2000.
3. The greater weight of the evidence establishes that the stress of Plaintiff's eye injury either caused or significantly contributed to the onset of his bipolar disorder. Dr. Lombardi opined that while the injury was not the cause, it was a significant contributor to Plaintiff's onset of bipolar disorder. He further opined that the loss of an eye is the kind of trauma that could lead to the development of psychiatric symptomatology, such as bipolar disorder. The opinions of other medical providers were fairly consistent with those of Dr. Lombardi. Dr. Melvin was of the opinion that the injury itself probably did not cause Plaintiff's bipolar disorder, but the stress related to the injury could have brought forth the bipolar disorder and pushed Plaintiff into a mood swing. Dr. Monteleone opined that the "accident at work was a significant intervening factor in the onset of the bipolar disorder." Dr. Highley diagnosed Plaintiff with "major depression, single episode with psychotic features, and a possible brief psychosis" that was in remission and opined that Plaintiff's symptoms were causally related to his eye injury. Dr. Ewert was of the opinion that the stress involved in Plaintiff's accident and the fact that he had received a corneal transplant were the traumatic incidents that triggered his bipolar disorder. Plaintiff has met his burden of proof. Holleyv. Acts, Inc., 357 N.C. 228, 233, 581 S.E.2d 750, 753 (2003);Young v. Hickory Business Furniture, 353 N.C. 227,38 S.E.2d 912 (2001).
4. Plaintiff's temporary total disability from his December 13, 2000 eye injury ended when he returned to work in March 2001. Based on Plaintiff's testimony that he did not miss any work due to his bipolar disorder, other than missing time at work for doctors' appointments, Plaintiff did not suffer any disability as a result of his bipolar disorder. Russell v. Lowe's ProductsDistribution, 108 N.C. App. 762, 765, 425 S.E.2d 454, 457
(1993).
5. Plaintiff is entitled to have Defendants pay for medical expenses incurred or to be incurred as a result of his compensable injury and resulting bipolar disorder, for so long as such treatment may reasonably be required to provide relief, effect a cure or lessen the period of disability. N.C. Gen. Stat. § 97-25.
6. Defendant-Insurer appealed this case to the Full Commission. The Deputy Commissioner awarded medical treatment to Plaintiff and the Full Commission hereby affirms that decision. The Full Commission therefore concludes that the costs of this appeal, including a reasonable attorney's fee, should be taxed to Defendant-Insurer pursuant to N.C. Gen. Stat. § 97-88.
 * * * * * * * * * * *
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay for all reasonable medical expenses for treatment of Plaintiff's bipolar disorder. Defendants shall pay all medical expenses incurred or to be incurred by Plaintiff as a result of his injury, when bills for the same have been approved in accordance with the provisions of the Act. Plaintiff's entitlement to further compensation is not before the Commission at this time.
2. Defendants shall pay attorney's fee as a part of costs of this appeal to the Full Commission pursuant to N.C. Gen. Stat. §97-88. Plaintiff's attorney shall submit to the Full Commission an affidavit and itemized statement of hours expended representing Plaintiff in this appeal to the Full Commission.
3. Defendants shall pay all costs.
This the __ day of July 2006.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_____________ PAMELA T. YOUNG COMMISSIONER
 S/_______________ LAURA K. MAVRETIC COMMISSIONER